**CITY OF ALEXANDRIA, VIRGINIA, Plaintiff,**

**Alexandria Historic Restoration and Preservation Commission, et al., Plaintiff–Intervenors,**

v.

**Rodney E. SLATER, U.S. Department of Transportation, et al., Defendants.**

**Civil Action No. 98–0251(SS).**

United States District Court, District of Columbia.

April 13, 1999.

John Norman Hanson, Beveridge & Diamond, P.C., Washington, DC, for City of Alexandria, Virginia.

Daniel Franklin Van Horn, Daria Jean Zane, U.S. Attorney's Office, Washington, DC, Eileen T. Mcdonough, Wells Daniels Burgess, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Scott J. Jordan, U.S. Department of Justice, Environmental Defense Section, Washington, DC, for Rodney E. Slater, Kenneth R. Wykle, Federal Highway Administration.

Thomas Richard Lotterman, Swidler, Berlin, Shereff & Friedman, L.L.P., Washington, DC, for National Trust for Historic Preservation in the United States, Preservation Alliance of Virginia.

Barry M. Hartman, Kirkpatrick & Lockhart, L.L.P., Washington, DC, for Greater Washington Board of Trade.

John Anthony Bielec, Prince George's County, MD, Upper Marlboro, MD, Sean Daniel Wallace, Office of the County Attorney, Upper Marlboro, MD, for Prince George's County, Maryland.

David P. Bobzien, Office of the Fairfax County Attorney, Fairfax, VA, for Board of Supervisors of Fairfax County, Virginia.

Edward S. Harris, Kevin Reynolds, Linda D. Strozyk, Baltimore, MD, for State of Maryland.

John Fontana Cooney, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, for Fairfax County Chamber of Commerce.

Richard L. Walton, Richmond, VA, for Commonwealth of Virginia, Virginia Department of Transportation.

Hope Madeline Babcock, Georgetown University Law Center, Washington, DC, for Sierra Club.

Schuyler William Livingston, Jr., Mitchell F. Dolin, Thomas Leon Cubbage, III, Covington & Burling, Washington, DC, for Alexandria Historic Restoration and Preservation Commission, Coalition for a Sensible Bridge, Inc., Historic Alexandria Foundation.

Joseph Michael Hannon, Jr., Thompson, O'Donnell, Markham, Norton & Hannon, Washington, DC, for Board of County Supervisors of Prince William County, Virginia.

### MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on Cross–Motions for Summary Judgment.[1] The relevant undisputed facts are set forth below.

The Woodrow Wilson Bridge (the "Bridge") is a six-lane drawbridge linking interstates I–495 and I–95. It is designed to carry approximately 75,000 vehicles per day across the Potomac river. It lies a few miles south east of the Nation's Capitol and just north of the historic City of Alexandria, Virginia. The Bridge was opened to traffic in 1961. Added use in recent years has caused increased traffic problems on the Bridge and at its interchanges. Travel demand across the Bridge now far exceeds the capacity for which it was designed. Projected travel in 2020 is estimated around 275,000 vehicles per day, requiring up to 18 lanes through the Bridge corridor. In part because of these projections, Congress passed the Woodrow Wilson Memorial Bridge Authority Act of 1995, providing for large-scale improvements at the river crossing site. It is the general consensus that the Woodrow Wilson Bridge needs to be replaced.

On November 25, 1997, the Federal Highway Administration ("FHWA") issued its Record of Decision ("ROD") approving a $1.6 billion highway project (the "approved project") which calls for replacing the Bridge with two parallel drawbridges, each with space for four general purpose lanes, one merge/diverge lane, and future accommodation of one High Occupancy Vehicle ("HOV") or "other type" lane.[2] The two new bridges would increase by about 260% the width of the river crossing now served by the Bridge and would rise an additional twenty feet above the Potomac River. The approved project also entails reconstructing a five mile stretch of the connecting interstate routes 495 and I–95 to accommodate twelve lanes: eight general purpose lanes, two merged/diverge lanes and two HOV lanes. In addition, the approved project authorizes substantial redesign and reconstruction of the four interchanges on either side of the bridge. The drawbridges would pass through Alexandria, Virginia's Historic District thirty feet south of the Bridge's present location.

Alexandria is one of America's most historic cities. Approximately one square mile of Alexandria is listed as a National Register Historic District. This District preserves the atmosphere of an early Virginian town, and contains three individually-designated National Historic Landmarks.[3] The approved project would pass through the southernmost portion of Alexandria four blocks south of the Alexandria National Historic Landmark District.

### 1. NEPA Compliance

The initial step to replace the Woodrow Wilson Bridge began in 1989 when the FHWA held a Bridge improvement design competition. While nothing substantial emerged from this effort, on May 17, 1990, the FHWA published a Notice of Intent to

---

**1.** The named Plaintiff, the City of Alexandria, is no longer a party to this action. Accordingly, reference is made to Plaintiff-intervenors only in the body of the opinion.

**2.** Hereinafter, the "8–2–2" lane configuration.

**3.** Gadsby's Tavern, Christ Church, and the Franklin and Armfield Slave Pen.

prepare a Draft Environmental Impact Statement ("DEIS"). The Notice stated that the purpose of the DEIS was to evaluate proposals to "improve the Woodrow Wilson Bridge and the I–95 approach roadway network between Telegraph Road in Virginia, and Indian Head Highway in Maryland." 55 Fed.Reg. 20556–02 (May 17, 1990).

Pursuant to the May 17 Notice, the first DEIS was published in August 1991. Joint Appendix at pp. 003371–3757.[4] It contained detailed evaluations of six alternatives requiring construction of a new river crossing and improved interchanges (so-called "build" alternatives), and an evaluation of one alternative requiring only repair of the existing Bridge (the "no build" alternative). All of the build alternatives presented in the 1991 DEIS were comprised of twelve lanes or more. JA003376–78. Furthermore, the 1991 DEIS twelve-lane build alternatives all called for physical separation of the local and express traffic, and complete reconstruction of certain interchanges. Despite the forseeable enormity of the construction required by the project, the 1991 DEIS included only three pages of analysis of potential construction impacts resulting from the various build alternatives.

In early 1992 the FHWA formed an independent review team ("IRT") to review and identify areas in the 1991 DEIS that might be challenged in court. JA003878. The IRT was composed of government attorneys and related professionals from the FHWA, Maryland, Virginia and the District of Columbia. JA003880. Although the IRT stated that the DEIS was "adequate," it found several serious deficiencies in the 1991 DEIS, including failure to discuss construction impacts adequately, failure to critically analyze the assumption that HOV lanes would be added to the Beltway, and failure to evaluate additional regional impacts adequately. Additionally, the IRT noted that the National Historic Preservation Act ("NHPA")

Section 106 analysis had not yet been initiated. JA003879. Shortly after the IRT concluded its review the FHWA ran a traffic analysis for a ten-lane river crossing. JA003898.

In June, 1992, the FHWA formed a Coordination Committee, comprised of elected officials and senior government executives from affected jurisdictions to coordinate project development. The FHWA intended to arrive at its preferred alternative project design through a "funneling" process. Accordingly, in the Spring of 1994 the Coordination Committee solicited suggestions for project alternatives from all interested individuals and organizations. While most of the suggestions the Committee received dealt with the river crossing portion of the project, the entire five-mile corridor was open for comment. In evaluating suggestions, the Committee applied a stepwise process of elimination. The Committee first weeded out suggestions it deemed duplicative, beyond the scope of the study, technically infeasible, or not in keeping with the project's purpose and need.

After initial screening, the FHWA combined the remaining suggestions into "unique and distinct crossing options and project area improvements." JA000068. These were then merged into a set of "end-to-end" alternatives: i.e. alternatives covering all facets of the project. The Coordination Committee reduced the number of end-to-end alternatives by applying three Measures of Effectiveness ("MOE"). The final MOE application results were presented in the January 1996 Supplemental Draft EIS ("SDEIS"). The six 1996 SDEIS build alternatives all had twelve lanes. Thus, the January 1996 SDEIS contained six "end-to-end" project alternatives, the only major design difference between them being the form (e.g. bridge or tunnel) and location of the river crossing.

4. Hereinafter, reference to the Joint Adminis-   trative Record will appear as "JA".

### 2. CAA Compliance

Pursuant to the Clean Air Act, in May 1996, the Region III Administrator of the FHWA asked the Transportation Planning Board ("TPB") to determine regional air quality conformity for a Bridge replacement with twelve lanes but "opening with only 10–lanes until the conditions for multi-modal, regional travel are reached." [Ex. 75.] In July, 1996, the TPB issued a draft conformity analysis for a "new 10 lane facility with either a $1.00 or $1.50 toll each way." [Ex. 76 at JA005185. para 130.] The draft conformity analysis found that a ten-lane bridge replacement with a $1.00 to $1.50 toll would conform to National Capital Region air quality standards.[5]

On September 27, 1996, days after the close of the comment period on the July 1996 SDEIS and nine days after the conformity assessment was approved, the Coordination Committee selected its Preferred Alternative. Then, pursuant to NEPA, the study team began preparation of the Final EIS ("FEIS"). The FEIS was released on September 2, 1997.

The FEIS explains the omission of ten-lane alternatives by stating that such configurations "cannot satisfactorily address the transportation needs of the region." FEIS JA000109–113. The FEIS reports that the ten-lane, no-HOV option was considered "in the early stages of the study ... [but] was dropped at that time ... because it was insufficient from a functional, safety and operational standpoint." JA000109. That conclusion follows solely from the reduced capacity of a ten-lane versus a twelve-lane crossing. At the same time, the FEIS notes that social, cultural and environmental impacts produced by a ten-lane alternative would be "essentially the same" as those produced by a twelve-lane alternative. JA000113. To support its conclusion, the FEIS includes a one page "Environmental Impact Matrix" purporting to break down the impacts of ten- and twelve-lane configurations with respect to fifteen environmental, social and cultural factors. JA000465. This table, in essence, purports to demonstrate that the cumulative negative effects on cultural, natural, and social resources of a twelve-lane alternative are not substantially different from those produced by a ten-lane alternative.

It is undisputed that alternatives with fewer than twelve lanes, without HOV lanes and physical separation of local and express traffic, were not subjected to detailed NEPA analysis. FHWA has maintained that such alternatives were properly excluded from NEPA analysis since they would not meet the purpose and need of the project.

### 3. NHPA and DOTA Compliance

Beginning in 1991 and pursuant to Section 106 of the National Historic Preservation Act and Section 4(f) of the Department of Transportation Act ("DOTA"), the FHWA began taking into account the potential effects of the project on sites eligible for listing on the National Register of Historic Places. The FHWA conducted investigations identifying cultural resources which might be adversely affected by the project, and solicited comments from interested parties. Between 1996 and 1995, the FHWA continued conducting cultural resource investigations which included, inter alia, research at the relevant State Historic Preservation Offices, the Library of Congress, and the National Archives. In addition, the FHWA coordinated archaeological excavations, aerial photographic surveys, and other field work aimed at identifying cultural and historic resources. JA000230.

In 1995, the FHWA defined the area of potential effects ("APE") of the project, demarcating the area which might be negatively impacted by the project. In January 1996, the FHWA issued a Cultural

---

5. The concept underlying imposition of a toll is based on the theory that a substantial toll charge will "drive away" certain price conscious prospective users.

Resources Technical Report ("CRTR"). The CRTR purported to serve as an "integrated compilation of all previous terrestrial and underwater archaeological/historic resource surveys, investigations, and determinations of effect," according to the FHWA. JA005629. Also in 1996, the FHWA circulated two proposed Memoranda of Agreement ("MOA"). Under Section 106 implementing regulations, the MOA represents formal agreement among the consulting parties as to how adverse effects of the project will be taken into account. 36 C.F.R. § 800.5. The two proposed 1996 MOAs were not signed by the consulting parties. Subsequent to the 1996 CRTR, the FHWA performed additional cultural and technical studies. In 1997, the FHWA substantially reduced the size of the project's APE, and circulated three more proposed MOAs. *See* JA006313. Signature to the final, October 1997, MOA was made predicate to future participation in identification of protected properties and mitigation efforts. *See* JA002100, JA006839. The final, October 1997, MOA was signed by the City of Alexandria, the District of Columbia State Historic Preservation Officer, the Maryland State Historic Preservation Officer, the Virginia State Historic Preservation Officer, the National Park Service, and the FHWA. Several interested parties did not sign the final MOA, including the Alexandria Historical Restoration and Preservation Commission and Old Town Civic Association. The City of Alexandria, which signed the final MOA, noted in an addendum to its signature page "the City . . . continues to believe that the FHWA has not adequately taken into account the effect of the [approved project] on historic resources, as required by Section 106[of the National Historic Preservation Act]." JA006841.

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In considering a motion for summary judgment the Court must assume the evidence of the non-movant, " 'and all justifiable inferences thereto', in the light most favorable to him." *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate where, as here, review is on the administrative record. *See, e.g. Lun Kwai Tsui v. Attorney General of the United States*, 445 F.Supp. 832, 835 (D.C.C.1978) ("summary judgment is appropriate after a review of the administrative record") (citing *Richards v. INS*, 554 F.2d 1173, 1177 n. 28 (D.C.Cir.1977)). A reviewing court shall look to the administrative record that was before the decision-maker at the time that the challenged action was taken. 5 U.S.C. § 706; *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). In reviewing an agency action under the Administrative Procedure Act ("APA"), the agency's action will be overturned if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). The Court's role is to "consider whether the decisions were based on a consideration of relevant factors and whether there was a 'clear error of judgment.' " *Corridor H Alternatives, Inc. v. Slater*, 982 F.Supp. 24, 28 (D.D.C. 1997) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

Here, there are no disputes as to the documents contained in the record. The parties only disagree as to their legal significance. Therefore, summary judgment is appropriate as the questions presented before this Court are solely legal in nature.

### II. Compliance with the Clean Air Act

■ Congress enacted the Clean Air Act ("CAA") in order "to protect and enhance the Nation's air quality, to initiate and accelerate a national program of research and development designed to con-

trol air pollution, to provide technical and financial assistance to the States in the execution of pollution control programs, and to encourage the development of regional pollution control programs." 42 U.S.C. § 7401(b) (1988). Pursuant to the CAA, to protect the public health, the EPA established National Ambient Air Quality Standards ("NAAQS") which reflect the maximum concentration levels of particular pollutants (criteria pollutants) allowable. *See* 42 U.S.C. § 7409 (1991). Responsibility for achieving and maintaining the NAAQS falls on the states, which are required to submit state implementation plans ("SIPs") to the EPA specifying the manner in which they will achieve and maintain the NAAQS for various criteria pollutants. *See* 42 U.S.C. § 7407. The EPA and the states have designated different regions according to the level of criteria pollutants in each area. *See id.* A region which has not attained the NAAQS for a certain criteria pollutant is designated a "nonattainment" area. The National Capital area where the approved project is located has been designated a "nonattainment" area for Ozone.

In 1990 Congress amended the CAA in an effort to spur progress toward attainment of the NAAQS. A key component of the 1990 CAA amendments was the addition of a requirement that all federal agencies and instrumentalities undertaking activities in a nonattainment area ensure that their project will conform to the relevant SIP. This is known as the "conformity requirement". In order to conform, the federally approved project must not cause or contribute to new violations, increase the frequency or severity of existing violations, or delay attainment of the NAAQS. *See* 42 U.S.C. § 7506(c)(1)(B). This requirement is repeated in the EPA regulations pertaining to federally assisted or approved transportation projects. *See* 40 C.F.R. 93.101 et seq. (requiring a conformity analysis for all transportation projects prior to agency approval, funding or implementation).

In May, 1996, the FHWA conducted a conformity analysis for a ten-lane river-crossing with tolls pursuant to the Bridge project. In 1997, the FHWA issued its ROD, approving a twelve-lane river crossing. The Plaintiff-intervenors argue the FHWA must perform a conformity analysis for a twelve-lane river crossing with no tolls, and that the ten-lane, with tolls conformity analysis is insufficient under the CAA.

Defendants state they do not need to perform a conformity analysis for the approved project because it is not significantly different from the ten-lane project that was found to conform. Specifically, they contend that since initially only ten lanes will be opened, the design scope of the approved project as initially operated does not differ from the ten-lane design assumed for the purposes of the conformity analysis. They admit, however, that when the river crossing becomes twelve lane operational as anticipated, they will have to perform a new conformity analysis.[6]

Neither the plain language of the CAA, nor the applicable regulations, provide the agency any such leeway. The statute and regulations state a conformity analysis must be completed prior to the approval, adoption, or implementation of a project. *See* 42 U.S.C. § 7506; 40 C.F.R. § 93.102. The EPA regulations define a project *In toto*, not, as only that part of a project that is constructed and used initially. *See* 40 C.F.R. § 93.101. The logical extent of defendant's argument, if adopted, would be to allow an agency to define a project differently depending on what particular

6. Defendants put forth the same argument with respect to the issue of tolls. At this time, they state, the provision of tolls is an uncertainty. The initial conformity analysis assumed tolls, they explain, in order to assuage a Congressional requirement of a sure funding source for the project. At this time, however, the provision of tolls on the bridge is uncertain, as the states of both Maryland and Virginia oppose tolls. If the approved project does not include tolls, the Defendants maintain, a new conformity analysis will be done.

purpose the agency has in mind at the time. For example, for NEPA purposes, the agency has defined the project as a twelve lane project; Yet, for CAA purposes, the approved project is only ten lanes in size. Such inconsistency in agency reasoning is unacceptable.

Plaintiff-intervenors further claim that the FHWA must perform another conformity analysis because the size of the interchanges has changed. Again, the FHWA disagrees. Defendants argue that consideration of the size of interchanges is immaterial for conformity analysis purposes. They note the regulations cite only to the number and location of the interchanges, not the size. This argument ignores the plain language of the regulation which states that design scope "includes" such things as the "number and location of interchanges ... etc". See 40 C.F.R. § 93.101 (emphasis added). This language does not limit solely to a consideration of the location and number of interchanges. The regulation contemplates otherwise. In this instance, the approved project consists of expanded interchanges necessary to accommodate the larger carrying capacity of a twelve-lane bridge. Just as the number of lanes may have an effect on air quality, due to the increase in emissions caused by more vehicles, so may the size of interchanges. Defendants must consider this factor in analyzing the project's impact on regional air quality before approval of the preferred alternative in the ROD.[7]

### III. Failure to Comply with NEPA's Reasonable Alternatives Requirement

Plaintiff-intervenors allege Defendants violated the National Environmental Protection Act ("NEPA") by failing to analyze all reasonable alternatives to their preferred action when preparing the FEIS, and by failing to take the required "hard look" at the environmental and other impacts of the preferred action.

NEPA states that any federal agency undertaking a "major federal action[ ]" likely to "significantly affect the human environment" must prepare an Environmental Impact Statement. The EIS must provide a " 'detailed statement' of the environmental impacts of the action, possible alternatives, and measures to mitigate adverse effects of the proposed action." See 42 U.S.C. § 4332(2)(C). While NEPA does not mandate any particular result, it requires the agency to follow particular procedures in its decision-making process. The purpose of these procedures is to ensure the agency has before it the best possible information in order to make an "intelligent, optimally beneficial decision" and to ensure the public is fully apprized of any environmental risks that may be associated with the preferred action. Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1114 (D.C.Cir.1971).

A key component of the EIS is the analysis of "reasonable alternatives." 40 C.F.R. § 1502.14(a). Agencies must "rigorously explore and objectively evaluate all reasonable alternatives" prior to selecting a specific project. Sierra Club. v. Watkins, 808 F.Supp. 852 (D.D.C.1991). Alternatives that present a feasible solution to the project's stated purpose and need of the project are reasonable. See Citizens Against Burlington, Inc., v. Busey, 938 F.2d 190, 193–94 (D.C.Cir.1991). While an agency may decline to give rigorous consideration to proposals that fall far short of the project's purpose and need, an agency may not eliminate an otherwise reasonable alternative solely because it presents only a partial solution to the stated purpose and need for the project. See NRDC v. Mor-

7. The EPA informed the FHWA in June, 1997 that it had "concerns about the air quality analysis of the project in the FEIS". Specifically, EPA stated "it is not clear that the proposed project will conform to the Clean Air Act implementation goals". June 11, 1997 Letter to Mr. David C. Lawton, Director Office of Planning and Program Development from EPA.

*ton,* 458 F.2d 827, 836 (D.C.Cir.1972). Indeed this Circuit has held that it is unreasonable "to disregard alternatives merely because they do not offer a complete solution to the problem." *Id.* at 836. However, agencies need not consider every conceiveable alternative. In determining the appropriate set of reasonable alternatives to be given "rigorous" consideration in the EIS, agencies must be guided by a "rule of reason." *Busey* at 194–195.

A second requirement of NEPA is that agencies take a "hard look" at the environmental impacts of their action. Agencies must consider the environmental effects of their actions "to the fullest extent possible" in order to satisfy this hard look requirement. *See* 42 U.S.C. § 4332.[8] The D.C. Circuit has interpreted this statutory provision to require that "environmental issues be considered at every important stage in the decision making process." *Calvert Cliffs',* 449 F.2d at 1118. In addition, the FHWA's own NEPA policy requires the agency give "balanced consideration" to transportational and safety factors, environmental impacts, and national, State, and local environmental goals in selecting its preferred alternative. *See* 23 C.F.R. § 771.105(b).

### A. *Standard of Review*

■ A court, in reviewing an alleged NEPA violation, is limited to determining whether the agency complied with the statute's procedural requirements. *Busey* at 195. So long as an agency has considered all reasonable alternatives and taken the requisite "hard look" at environmental fac-

tors, its substantive decision will not be overturned by a court unless it is "arbitrary, capricious, or an abuse of discretion." *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Notwithstanding the judicial deference given to an agency's substantive choice, the D.C. Circuit has required "strict compliance" with NEPA's "inflexible" procedural requirements. *See* 449 F.2d at 1109.

### B. *Failure to Analyze all Reasonable Alternatives*

■ Plaintiff-intervenors contend the FHWA did not consider "all reasonable alternatives" prior to selecting its preferred action. They allege the FHWA predetermined the project's lane configuration and unreasonably failed to consider the diminished environmental impact of a ten-lane alternative with smaller interchanges.

Defendants claim the agency did in fact consider an appropriate range of reasonable alternatives, including ten- and eight-lane bridge-crossings.[9] According to Defendants, the FHWA gave ample consideration to a ten-lane alternative, and took a hard look at the environmental impacts of such a project.[10] Indeed, at several places in the FEIS the FHWA notes that the ten-lane project was rejected after such consideration because it failed to meet the purposes and needs of the project. Specifically, the FEIS states that any bridge-crossing with fewer than twelve lanes and no HOV capacity could not alleviate projected future traffic con-

---

8. The CEQ regulations implementing NEPA mirror this statutory requirement. 40 C.F.R. §§ 1502.1 and 1502.2(b). (An agency's EIS must provide a " 'full and fair' discussion of the significant environmental impacts" of the project.)

9. In 1995 the Coordination Committee dropped the eight-lane alternative because it was projected that it would not alleviate traffic congestion on and around the bridge, nor could it accommodate HOV lanes on the river crossing.

10. The FHWA cites to three pages in the FEIS that discusses the various costs and benefits of a ten-lane project as opposed to a twelve lane. In addition, they cite to a May 1996 retreat at which time the Coordination Committee discussed a ten lane alternative, weighed the comparative environmental and other impacts, and decided that environmental benefits of the ten lane were minimal.

gestion. Furthermore, the FEIS notes that the environmental, socio-economic, and cultural benefits of a ten-lane crossing are minimal. To support this position Defendants cite to a one-page "Environmental Impact Matrix" ("Matrix") in the FEIS which compares various ten and twelve lane alternatives vis-a-vis fifteen environmental, socio-economic, and cultural factors. *See* JA000465.

This Court finds that the FEIS does not support FHWA's claim that they gave the ten-lane alternative adequate consideration. The Environmental Impact Matrix does not begin to give a complete indication of the environmental, social, and cultural costs and benefits of a ten-lane versus a twelve-lane crossing. For example, the Matrix shows that both ten- and twelve-lane alternatives would affect five public parks. Yet no indication is given as to the nature or extent of any such impact on the five parks. The analysis of air impact in the Matrix demonstrates this point even more fully. The Matrix indicates no adverse impact

Additional deliberation is required before the agency can conclude that its twelve lane proposal will have zero impact on air quality, when it has yet to undertake any conformity analysis as required by the CAA. Indeed, the EPA, in reviewing the draft FEIS, indicated that the FEIS's analysis of "air impact" was inadequate. *See* June 11, 1997 Letter to Mr. David C. Lawton, Director Office of Planning and Program Development from EPA.

The consideration that the FHWA gave to a ten-lane alternative prior to the publication of the FEIS demonstrates the agency's insufficient analysis as well. In soliciting proposals for its 1990 concept competition, the agency specified that all plans be a minimum of fourteen lanes and have HOV capacity. Thus, in its first Draft EIS, the agency did not consider a ten-lane alternative. Then, between 1992 and 1996 when the Coordination Committee was reviewing proposals, the narrowing of alternatives was based on a set of criteria that focused primarily on transportation and safety issues JA000109. This narrowing was done without the benefit of any detailed analysis of the environmental and cultural costs and benefits of a ten-lane or smaller bridge-crossing.

Defendant's state that they did not need to give detailed consideration to a ten-lane alternative because it did not meet the agency's stated purpose and need for the project. The FEIS in its "Project Need" statement articulates the problem as one of addressing the future transportation needs of the region within the context of the Constrained Long–Range Plan for the National Capitol Region. Such a broad statement of purpose and need hardly provides an unequivocal basis for eliminating ten-lane alternatives from consideration without rigorous comparison of the environmental, socio-economic, and cultural benefits. Moreover, the limited analysis the FHWA did on a ten-lane alternative demonstrates that it could possibly provide a partial solution to the problem. The FHWA's own traffic analysis of a ten-lane alternative demonstrates that it can handle up to 295,000 vehicles per day. This is close to total satisfaction of the estimated maximum 300,000 vehicles per day which will cross the river in 2020. To eliminate all ten-lane alternatives from "rigorous" consideration simply because they fall short of the total future estimated demand by 2 percent does not stand up to the rule of reason which must guide the agency in making its determination.

Given that a ten-lane alternative presents a feasible alternative, the FHWA should have assessed closely the benefits associated with it. The three pages discussing the environmental and other benefits of a ten-lane project, and the Matrix comparing them, falls short of providing the kind of detailed analysis necessary to support an agency's decision under

NEPA.[11]

There is a logical inconsistency in the agency's reasoning. First, the FHWA attempts to support its decision under NEPA by stating that a ten-lane bridge without HOV lanes could not satisfy the "statement of purpose and need". In contrast, for purposes of the CAA, the FHWA characterizes the project as a ten-lane river crossing The FHWA's effort to re-characterize the fundamental nature of the approved project so as to satisfy both NEPA and CAA cannot be reconciled. The river crossing is either ten lanes or it is twelve. It cannot be both.

### C. *Failure to Adequately Assess Construction Impacts*

■ The Plaintiff-intervenors further claim the FHWA failed to take the required "hard look" at the immediate and long-term impacts associated with the construction of the approved project. Specifically, they point to insufficient identification and assessment of the construction impacts in the FEIS.

NEPA requires the agency make available to public officials and citizens the environmental impacts of an action prior to selecting a preferred course of action. *See Simmons v. U.S. Army Corps of Engineers,* 120 F.3d 664 (7th Cir.1997). In order to satisfy this requirement, the FEIS must identify and analyze the effects the project is projected to have on environmental factors. *See NRDC v. Hodel,* 865 F.2d 288, 294 (D.C.Cir.1988). The 1997 FEIS prepared by the FHWA in anticipation of their ROD failed to do this. Defendants cite to approximately four pages in

the FEIS which discuss the construction impacts likely to be associated with the project as evidence of their compliance. However, the discussion of construction impacts is of such a broad and generic nature that it could apply to practically any construction project undertaken by the FHWA. For example, in identifying and quantifying the amount of air emissions, the FEIS flatly states "the construction phase has the potential of temporarily impacting ambient air quality due to emissions from construction equipment and dust from earthwork and the utilization of unpaved roads." The FEIS neither attempts to quantify such air emissions, nor describes how such impact could affect the human and non-human environment. Discussions of noise,[12] visual,[13] and other impacts in this section are similarly vague and non-informative. Such terse summaries of the likely effects do not come close to providing the public with the kind of information necessary to weigh the environmental costs and benefits of the project. The Environmental Protection Agency noted as much in its assessment of the Draft FEIS. The EPA stated that the FEIS should present a "worse case quantitative estimate of potential acreage impacts to wetlands and aquatic resources", expand on the development of a mitigation plan, and identify the impacts on the federally-protected bald eagle and osprey. *See* June 11, 1997 Letter to Mr. David C. Lawton, Director Office of Planning and Program Development from EPA. The agency did not accept the EPA's recommendation in finalizing the FEIS.

---

11. Obviously, reconsideration of the lane configuration will require further review of the various interchange designs that accompany the river-crossing portion of the project. In light of this Opinion it is assumed the agency will consider all reasonable interchange alternatives as part of its reconsideration of final, end-to-end alternatives. Therefore, this Court need not consider in detail Plaintiff-intervenors claim that defendants failed to consider reasonable alternatives to its "preferred" interchange designs.

12. The FEIS predicts that "an increase in project noise levels would occur during the construction of the proposed project" and that a noise study "will be performed during the design phase of the study to analyze the potential noise impacts of specific construction impacts." JA000470.

13. The FEIS states only that "views may be temporarily affected."

### III. The FHWA Failed to Complete its Identification of Protected Properties under the NHPA.

Federally funded highway projects must comply with both Section 106 of the National Historic Preservation Act, 16 U.S.C. §§ 470f, 470h–2(f), and Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303.

To satisfy Section 4(f), the FHWA must first identify all protected properties that may be affected by a potential project. *See Corridor H. Alternatives, Inc. v. Slater,* 982 F.Supp. 24, 31 (D.D.C.1997). A property is protected under the DOTA if it is "a park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site)." 49 U.S.C. § 303(c). The FHWA must then determine if the project will "use" any protected properties. Finally, if the project calls for "use" of protected properties, the Secretary of the FHWA must do "all possible planning" to minimize harm to those properties. 49 U.S.C. § 303(c)(2); *See Druid Hills Civic Ass'n, Inc. v. Federal Highway Admin.,* 833 F.2d 1545, 1547–48 (11th Cir.1987).

Section 106 of the National Historic Preservation Act provides that any agency having jurisdiction over a federally-assisted project "shall, prior to the approval of expenditure of any Federal funds on the undertaking ... take into account the effect of the undertaking on [any district, site, building, structure, or object that is included or eligible for inclusion in the National Register]." 16 U.S.C. § 470f. Under regulations implementing Section 106, the FHWA is required to identify historic properties within the area of potential effects of the project, and must perform an analysis of the likely impacts on those properties. *See* 36 C.F.R. Part 800 (1998); *Colorado Indian Tribes v. Marsh,* 605 F.Supp. 1425, 1435–38 (C.D.Cal.1985).

It is clear that compliance with Section 4(f) is partially predicated upon completion of a Section 106 analysis of impacts on historic properties. The regulations implementing Section 106 and Section 4(f) define historic properties in substantially the same way. Sections 4(f) regulations identify historic properties as "all properties on or eligible for the National Register of Historic Places." 23 C.F.R. § 771.135(e). Regulations implementing Section 106 define historic properties as all properties listed on or eligible for listing on the National Register of Historic Places. 36 C.F.R. § 800.2(e) (1998). Therefore, to identify pursuant to Section 4(f) all places of historic significance that will be used by a project, the agency must have satisfied the Section 106 identification requirement. *See Corridor H Alternatives, Inc. v. Slater,* 166 F.3d 368, 372 (D.C.Cir.1999). As Judge Hogan recently stated, because "Section 4(f) duties with respect to historic sites are tied to a review of historic resources under Section 106 of the NHPA, it follows that an agency must complete its Section 106 determinations before it can begin compliance with Section 4(f)." *Corridor H,* 982 F.Supp. at 32. Likewise, it follows that an agency cannot reasonably be expected to do "all possible planning" to minimize harm to protected properties as required by DOTA Section 4(f) without first having completed a detailed and comprehensive list of protected historic resources potentially affected by the project.

Plaintiff-intervenors contend that FHWA violated both Section 106 of the NHPA and Section 4(f) of the DOTA. First, Plaintiff-intervenors claim that the FHWA did not take sufficient steps to identify historic resources which would be used by the project under Section 106. Second, Plaintiff-intervenors maintain that the FHWA did not do "all possible planning" to minimize harm as statutorily required by Section 4(f) of the DOTA.

In support of their argument that the FHWA did not conduct a sufficient NHPA and DOTA historic resource identification process, plaintiff-intervenors point to statements made in the MOA. The MOA, for example, says that "the Project may have an effect on additional properties [not identified in the MOA] that are eligible for inclusion in the National Register, as the result of activities related to implementa-tion of the Project, including, but not limited to construction staging, dredge disposal, wetland mitigation, or other ancillary activities . . .". JA 002089. Plaintiff-intervenors contend that the locations and effects of such activities are reasonably forseeable, and therefore could be designated prior to adoption of the approved project in the ROD. The MOA also envisions the preparation of an Historic Resources Identification and Evaluation Report (the "Report"), "identify[ing] and evaluat[ing] the defining historical characteristics of the Alexandria Historic District within the APE." JA002090–91. The plaintiff-intervenors point out that the MOA is largely promissory in nature, providing little in the way of concrete identification of protected resources and mitigation plans. By not identifying all protected resources prior to approval, plaintiff-intervenors state that the FHWA violated the DOTA and the NHPA

Defendants explain that since the project design has not been completed as to certain activities, no identification need be done at this point. The Defendants in essence propose putting off decision on the location and extent of construction staging and dredge disposal, as well as certain undefined "ancillary activities." This necessarily puts off identification of protected resources which might be affected by design of those elements. *See* MOA at JA002089. The FHWA argues that such activities may be legitimately dealt with by execution of the MOA. The FHWA further claims that the Report does not represent an effort to attenuate the Section 106 identification process, but to "continue the Section 106 consultation process" both as to

identified properties and those not yet identified. Def.[s'] Br. at 66.

The Section 4(f) process must be completed before the ROD is issued. *See* 166 F.3d 368, 373 (citing the "explicit requirement" that "[the FHWA] complete the section 4(f) process before [it] issues the ROD"). Here, the identification process was not completed prior to issuance of the ROD. Identification of historic properties possibly affected by dredge disposal sites and construction staging is expressly postponed. An "Historic Resources Identification and Evaluation Report" is exactly what the NHPA and DOTA call for; namely, identification of historic sites and evaluation of the adverse impacts on them. Such a report must be prepared as part of the Section 106 process prior to the issuance of the ROD.

That the ROD approves a project design postponing full compliance with the NHPA and the DOTA is not adequate. An agency is not allowed to approve a less-than-fully designed project in the ROD merely to avoid having to complete its 4(f) and 106 analyses. Such a holding would vitiate the purposes behind Sections 4(f) and 106. Where aspects of the project can be feasibly determined prior to the ROD, those aspects should be factored into the Section 4(f) and 106 analyses. Here, the MOA merely reflects agreement by the signatory parties to postpone identifying "properties" and mitigation procedures.

Because this Court concludes that the FHWA has failed to complete the required identification of protected affected properties under Section 4(f) of the DOTA and Section 106 of the NHPA, it need not address the Plaintiff-intervenors' argument that the FHWA failed to do "all possible planning" as required by the DOTA Section 4(f). This will have to be done in the agency's reconsideration of its project.

As Defendants have not complied with their obligations under the CAA, NEPA, NHPA and the DOTA, this Court has no

choice but to hold that the agency abused its discretion in issuing its ROD in 1997 and remand this matter for further agency action. Accordingly, construction on the new bridge can not commence until the agency has fulfilled its responsibilities under these statutes.

The court is reluctant to order this action. These statutes have as their purpose the protection of various aspects of the public interest. Despite their intended purpose, they often cause regulatory gridlock which results in necessary projects being interminably delayed. It is clear an expanded bridge crossing linking the North and South at the Nation's Capital is sorely needed. While a return to the simpler days of the past might better satisfy the concerns of the public interest statutes involved here, progress must nevertheless occur. Simply put, an expanded bridge over the Potomac River is necessary if this Nation's Capital and its surrounding neighborhoods are not going to suffer paralysis.

The City of Alexandria along with the other municipal areas that would be affected by the proposed construction have now all signed off on the project.[14] While administrative reconsideration of the project is all that this Court can order, the Project to be put on a real time basis might require direct intervention by the Congress, which after balancing all the public interest aspects could "by pass" the regulatory gridlock that has developed.[15]

An appropriate order granting Plaintiff-intervenors' motion for summary judgment and denying that of the Defendants accompanies this Memorandum Opinion.

14. Recently, the City of Alexandria, an original plaintiff in this litigation, entered into a settlement with the Defendants. The agreement calls for:

1. Construction of direct access to Eisenhower Avenue from 495.
2. Study of the impact of eliminating a Church Street exit ramp from the project, and the implementation of design measures to mitigate adverse impact on residential areas in the event the exit ramp is not eliminated.
3. A commitment to harmonize the construction of an "urban deck" with the redevelopment of Jones Point Park and portions of the George Washington Parkway south.
4. A maximum width of the project in specific areas and the absence of permanent physical structures in others.
5. The retention of certain project features that provide access to connecting highways and interchanges, such as Route I and I-195.
6. A study of the feasibility of a new river crossing south of the Woodrow Wilson Bridge.

This appears to be a positive step in bringing this important and worthwhile project to fruition. It would be hoped that at some point the other plaintiffs would show similar flexibility in resolving the particular issues of concern to them. Sometimes citizens groups with well intended objectives get so caught up in their own zeal that they lose sight of overall societal needs and the public interest as a whole suffers. Without an appropriate and measured balance of all of society's needs, the requirements of a nation to tend to the needs of all of its citizens cannot be achieved.

15. This court is somewhat puzzled by the proposed design of the new bridge which calls for it to be a "draw bridge." It is estimated that the bridge would be required to be opened some 200 times a year. With a projected use by some 300,000 vehicles a day, traffic bottlenecks caused by opening and closing the bridge could well be intolerable. As this nation is about to enter the 21st Century, it seems incongruous to be adopting a technology that would be better understood by our grandparents of a century ago. Certainly at this late date, a suspension bridge design would not require any new engineering feat and would seem to better meet the needs to be served by the new Potomac River crossing. Since the project needs to be "rethought" it is hoped that this issue would be included in the "rethinking" process.