CORRIDOR H ALTERNATIVES, INCORPORATED, et al., Appellants,

v.

Rodney SLATER, Secretary, U.S. Department of Transportation, et al., Appellees.

No. 97–5301.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1998.

Decided Feb. 9, 1999.

Andrea C. Ferster, with whom Thomas R. Michael was on the briefs, argued the cause for appellants.

Elizabeth S. Merritt, with whom Paul W. Edmundston, Laura S. Nelson, Thomas S. Martin and Thomas B. Wiener were on the brief, argued the cause for amici curiae National Trust for Historic Preservation, et al.

Sheila D. Jones, with whom Lois J. Schiffer, Assistant Attorney General, U.S. Department of Justice, John A. Bryson, and Marta Hoilman, Attorneys, Brett J. Gainer, Attorney–Advisor, Federal Highway Administration, and William G. Malley were on the brief, argued the cause for appellees. Greer S. Goldman, Attorney, U.S. Department of Justice, and Eliot R. Cutler entered appearances.

Before WALD and TATEL, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the court filed by Senior Circuit Judge BUCKLEY.

BUCKLEY, Senior Judge:

Corridor H Alternatives, Inc., and several other environmental and public interest groups (collectively, "CHA") challenge a highway project in West Virginia that had been developed and approved by various federal and state agencies. Specifically, they assert (1) that the Federal Highway Administration violated the Department of Transportation Act by failing to identify all the historic sites it was charged with protecting prior to its decision approving the route of the proposed highway and by erroneously concluding that the highway would not "use" two of the sites it did identify; and (2) that the agency violated the National Environmental Policy Act by failing to give adequate consideration to the improvement of existing roads as an alternative to the construction of the new highway.

The district court held that the agencies had complied with both statutes. Because we conclude that the Federal Highway Administration was required to identify the historic sites that might be at risk before it issued its decision approving the highway's proposed route, we affirm in part and reverse in part with instructions to the district court to remand the matter to the Administration.

## I. Background

Congress enacted the Appalachian Regional Development Act of 1965, 40 U.S.C. app. §§ 1 *et seq.* (1994), in order to stimulate economic development in Appalachia by providing the "basic facilities" that were believed essential for the region's growth. These facilities were to include an "Appalachian development highway system" and a supporting network of local access roads. *See id.* §§ 2(a), 201(a).

Congress assigned responsibility for planning the new system to the Appalachian Regional Commission, which is composed of representatives of the Federal Government and the participating States. *Id.* § 101(a). The Commission was directed to designate "general corridor locations and termini of the development highways." *Id.* § 201(b). Pursuant to this authority, the Commission approved a plan for a 13–state regional highway system that called for the establishment of 23 corridors, each of which would contain a highway that would permit anticipated traffic to proceed in safety between major termini at an average speed of 50 miles per hour, commensurate with the terrain. *See* Joint Appendix ("J.A.") at 289, 486.

The Commission did not map the corridors; it merely identified their terminal points. The task of determining their exact routes was left to the Federal Highway Administration ("FHWA" or "Administration") and the affected states. In the case of Corridor H, which is the subject of this litigation, the Commission merely established that it was to extend from Interstate 79 ("I–79") near Weston, West Virginia, eastward to Interstate 81 ("I–81") near Strasburg, Virginia. J.A. at 455.

Between 1982 and 1994, a 40–mile section of the new Corridor H highway was built from its I–79 terminus to a point just west of Elkins, West Virginia. In 1996 the State of Virginia decided to withdraw from the project, with the result that the eastern terminus is now located in West Virginia just west of its border with Virginia. The present plan calls for the building of approximately 100 more miles.

Federally funded highway projects must comply with a number of statutory requirements. Those relevant here are section 106 of the National Historic Preservation Act, codified at 16 U.S.C. § 470f (1994) ("section 106"); section 4(f) of the Department of Transportation Act, codified at 49 U.S.C. § 303 (1994) ("section 4(f)"); and the environmental impact analysis mandated by the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* (1994) ("NEPA").

Section 106 of the National Historic Preservation Act provides that before a federal agency may authorize the expenditure of funds for a federal or federally assisted undertaking, it must first consider the effects of such an undertaking on "any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f.

The Advisory Council on Historic Preservation regulations implementing section 106 establish three steps that an agency must take in order to comply with section 106. First, the agency must identify the properties that are listed or eligible for listing in the National Register. 36 C.F.R. § 800.4 (1998). Next, it must evaluate the effects of the proposed undertaking on those properties. *Id.* § 800.5. Finally, if the agency determines that the project would have an adverse effect on a historic property, it must consider measures to mitigate the potential damage. *Id.*

Section 4(f) of the Department of Transportation Act states that the Secretary of Transportation

> may approve a transportation program or project ... requiring the use of ... land of an historic site of national, State, or local significance ... only if—
>
> > (1) there is no prudent and feasible alternative to using that land; and
> >
> > (2) the program or project includes all possible planning to minimize harm to the ... historic site resulting from the use.

49 U.S.C. § 303(c). The Secretary has delegated this responsibility to the FHWA. 49 C.F.R. § 1.45(4) (1997). The FHWA's regulations implementing section 4(f) identify the historic sites that are subject to the section

as "all properties on or eligible for the National Register of Historic Places." 23 C.F.R. § 771.135(e) (1998). Because the historic properties protected by section 106 are similarly defined, it follows that the agency must complete its section 106 determinations before it can comply with section 4(f).

The National Environmental Policy Act requires that an environmental impact statement ("EIS") be prepared for any "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must include, among other things,

> a detailed statement ... on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and]
>
> (iii) alternatives to the proposed action. . . .

*Id.* In a case requiring an EIS, the agency must prepare a "concise public record of decision" that identifies all the alternatives it has considered and describes all the factors it has taken into account in reaching its decision. 40 C.F.R. § 1505.2 (1998).

The U.S. Department of Transportation, the FHWA, and the West Virginia Department of Transportation ("WVDOT") (collectively, "the agencies") began planning for the Corridor H project in the late 1970's. They produced a draft environmental impact statement in 1981 but suspended work on the project until 1990. They then decided to proceed with the environmental review in two stages, each of which resulted in the issuance of a draft EIS.

The first of these, the Corridor Selection Draft EIS ("CSDEIS"), was issued by WVDOT in 1992. It was concerned with the demarcation of the actual 2,000-foot-wide route that Corridor H would take from Elkins, West Virginia, to its eastern terminus, which was then located on I–81 in Virginia. In conducting this review, WVDOT considered five alternatives, including: the construction of a new four-lane highway (the "Build Alternative"), improvements of existing two-lane roads (the "Improved Roadway

Alternative"), and the self-described "No Build Alternative." It concluded that only the Build Alternative and the No Build Alternative merited more detailed evaluation because the Improved Roadway Alternative would not be able to achieve the project's speed and safety objectives. J.A. 292.

The second study, the Alignment Selection Draft EIS ("ASDEIS"), was completed two years later, in 1994. Its purpose was twofold: to evaluate the environmental impact of numerous 200- to 250-foot-wide "alignments" of the highway itself, i.e., the actual ground within Corridor H that the proposed four-lane highway would occupy, and to reexamine the Improved Roadway Alternative. WVDOT issued its Final EIS ("FEIS") on April 8, 1996, establishing the boundaries of Corridor H and reaffirming its decision to proceed with the four-lane Build Alternative.

The FEIS adopted a "Programmatic Agreement," earlier entered into by the FHWA and the relevant historic preservation officials, which established the procedures that would be followed by the FHWA in complying with the requirements of section 106. The Programmatic Agreement divided Corridor H into 14 segments or sections and required the FHWA to identify the historic properties in each of them in the sequence set forth in the agreement, to assess the project's impact on the properties, and to "utilize all feasible, prudent and practicable measures to avoid adverse effects" to them. It also stipulated that "[n]o work shall proceed in any section which precludes consideration of alternate alignments in [s]ections where treatment of historic properties has not yet been finalized." Programmatic Agreement, *reprinted in* J.A. at 185–98.

Four months later, in August 1996, the FHWA issued its Record of Decision for the Corridor H project ("ROD"). The ROD approved the FEIS's selection of the four-lane Build Alternative as the preferred basis for the project as well as its adoption of the corridor route and highway alignments favored in the CSDEIS and ASDEIS, as modified to avoid the constructive use of the Corricks Ford and Moorefield Civil War battlefields. The FHWA concluded that by vir-

tue of these modifications, the highway would not "substantially impair" the battlefields.

The ROD also incorporated the Programmatic Agreement's segment-by-segment approach to compliance with section 106. In recognition of the fact that the section 4(f) process could not be completed prior to the identification of the protected historic sites pursuant to section 106, the ROD specified that its approval of the project was conditional only and would not become final, as to any section of the corridor, "until the Section 106 process has been completed for that section and for any immediately adjacent section(s)." Record of Decision at 16, *reprinted in* the J.A. at 302.

CHA challenged the approval of the Corridor H project in district court. In considering the parties' cross motions for summary judgment, the court observed that both parties had advanced reasonable arguments in support of their respective positions; but because of the deference due to agency decisions that are not arbitrary or capricious, the court felt obliged to grant summary judgment in favor of the agencies on all counts of the complaint. *See Corridor H Alternatives, Inc. v. Slater,* 982 F.Supp. 24, 35 (D.D.C. 1997).

## II. Discussion

On appeal, CHA argues that the FHWA (1) violated section 4(f) both by deferring the investigations of the historic sites until after the issuance of the ROD and by adopting the Programmatic Agreement's incremental, segment-by-segment approach to implementing the section; (2) acted arbitrarily and capriciously and contrary to section 4(f) when it determined that the project would not substantially impair the two Civil War battlefields; and (3) violated NEPA by rejecting the improvement of existing two-lane roads as a reasonable alternative to achieving the objectives of Corridor H. We address these claims in turn.

### A. Section 4(f)

 FHWA regulations establish the procedures that must be followed in complying with section 4(f). We defer to the FHWA's interpretation of its regulations unless "it is plainly erroneous or inconsistent with the regulation itself." *Canadian Am. Oil Co. v. NLRB,* 82 F.3d 469, 473 (D.C.Cir. 1996).

CHA and the agencies base their cases on different sections of the regulations. In support of their claim that the FHWA is required to complete the section 4(f) process for the entire Corridor H project before issuing the ROD, CHA cites sections 771.135(b) and (*l*) of the agency's regulations. Section 771.135(b) directs that

[a]ny use of lands from a section 4(f) property shall be evaluated early in the development of the action *when alternatives to the proposed action are under study.*

23 C.F.R. § 771.135(b) (1998) (emphasis added). Section 771.135(*l*) (1998) provides that in cases requiring the preparation of an EIS, the agency "will make the section 4(f) approval *either in its approval of the final EIS or in the ROD.*" *Id.* § 771.135(*l*) (emphasis added).

The agencies, on the other hand, contend that sections 771.135(m) and (n) permit the FHWA to prepare separate 4(f) evaluations after it has issued the ROD. Section (m) states in relevant part:

Circulation of a separate section 4(f) evaluation will be required when:

(1) A proposed modification of the alignment or design would require the use of section 4(f) property after the . . . draft EIS, or final EIS has been processed;

(2) The Administration determines, after processing the . . . draft EIS, or final EIS that section 4(f) applies to a property;

(3) A proposed modification of the alignment, design, or measures to minimize harm (after the original section 4(f) approval) would result in a substantial increase in the amount of section 4(f) land used, a substantial increase in the adverse impacts to section 4(f) land, or a substantial reduction in mitigation measures; or

(4) Another agency is the lead agency for the NEPA process, unless another [Department of Transportation] element is preparing the section 4(f) evaluation.

23 C.F.R. § 771.135(m) (1998). Section (n) continues:

> If the Administration determines under § 771.135(m) *or otherwise*, that section 4(f) is applicable after the ... final EIS has been processed, the decision to prepare and circulate a section 4(f) evaluation will not necessarily require the preparation of a new or supplemental environmental document.

23 C.F.R. § 771.135(n) (1998) (emphasis added). The agencies argue that while subsection (n) requires the FHWA to issue a separate section 4(f) evaluation in any of the four circumstances listed in section (m), it does not state that these are the only circumstances in which a separate 4(f) evaluation is permitted. They then point to the phrase "or otherwise" in subsection (n) which, they claim, would be meaningless if it did not permit separate analyses under circumstances other than those described in the prior subsection. Thus, they maintain, the regulations permit the FHWA to use a "separate evaluation" in this case.

■ This argument is more resourceful than persuasive. Because they do not claim that any of the four situations described in subsection (m) apply here, the agencies are asking us to give greater weight to their creative interpretation of "or otherwise" than to the crystalline command, in subsections (b) and (*l*), that the 4(f) evaluations be made while "alternatives to the proposed action are under study" and that the FHWA complete the 4(f) process no later than in the ROD. *Id.* § 771.135(b), (*l*). While deference is normally due an agency's interpretation of its own rules, that is not the case where "an alternative reading is compelled by the regulation's plain language." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (internal quotation marks omitted). It is hard to imagine less ambiguous directives than those on which CHA relies.

Nor are we impressed by the agencies' remaining arguments. They assert that their sequential, segment-by-segment approach is authorized by subsection (*o*) of the regulations, which provides in relevant part:

> (*o*) An analysis required by section 4(f) may involve different levels of detail where the section 4(f) involvement is addressed in a tiered EIS.
>
> (1) When the first-tier, broad-scale EIS is prepared, the detailed information necessary to complete the section 4(f) evaluation may not be available at that stage in the development of the action. In such cases, an evaluation should be made on the potential impacts that a proposed action will have on section 4(f) land and whether those impacts could have a bearing on the decision to be made....
>
> (2) A section 4(f) approval made when additional design details are available will include a determination that:
>
> (i) The preliminary section 4(f) determination made pursuant to paragraph (*o*)(1) of this section is still valid....

23 C.F.R. § 771.135(*o*) (1998).

This section permits a preliminary, first tier 4(f) determination in circumstances where the unavailability of critical information precludes the completion of the kind of evaluation section 4(f) requires. Even then, the validity of the final, second tier 4(f) approval is dependent on the ability of the agency to affirm that the preliminary determination remains valid. Here, however, the agencies have failed to make even the preliminary section 4(f) determination subsection (*o*)(1) requires.

Finally, we also reject the agencies' contention that section 771.105 of the regulations authorizes post-ROD compliance with section 4(f). Section 771.105 sets forth the FHWA policy that "[t]o the fullest extent possible, all environmental investigations ... be coordinated as a single process...." 23 C.F.R. § 771.105(a) (1998). While there is obvious merit to coordinating environmental reviews of the kind required by NEPA and section 4(f), we do not read section 771.105 as authority for the agencies to disregard the explicit requirement, in sections 771.135(b) and (*l*), that they complete the section 4(f) process before the FHWA issues the ROD.

Because we conclude that the agencies have failed to comply with section 4(f), we need not address their finding that Corridor

**374**

H will not "use" the Corricks Ford and Moorefield Civil War Battlefields.

B. NEPA

■ CHA also claims that the ROD failed to comply with NEPA's requirement that adequate consideration be given to the Improved Roadway Alternative ("IRA"). The agencies respond that they sufficiently evaluated the IRA and decided that it could not meet the needs of the project.

■ At "the heart of the environmental impact statement," 40 C.F.R. § 1502.14 (1998), is the requirement that it identify the reasonable alternatives to the contemplated action and

> present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public.

*Id.* The statute, however,

> directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, [and we] correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures....

*Citizens Against Burlington, Inc. v. Busey IV,* 938 F.2d 190, 194 (D.C.Cir.1991). We have recognized that a "rule of reason" applies both to an agency's identification of the available alternatives and to its examination of their relative merits, and we have declared that we will defer to its conclusions "so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Id.* at 196.

We are satisfied that the agencies have met NEPA's "hard look" requirement and that they have adequately supported their determination that the IRA would not advance Congress's goal of providing West Virginia with the "basic facilities" essential for its economic growth. *See* Appalachian Regional Development Act of 1965, 40 U.S.C. app. § 2(a). In section II of the CSDEIS, entitled *"Alternatives Considered,"* the WVDOT reviewed the merits and deficiencies of five alternatives, including the No Build

Alternative, the four-lane Build Alternative, and the IRA in light of Congress's objective of developing a regional highway system and the design standards established for the system by the Appalachian Regional Commission. In its review of the IRA, the WVDOT discussed in detail the reasons why that alternative could not adequately address issues such as roadway deficiencies, safety considerations, and regional system linkage. We therefore defer to the agencies' decision to proceed with the four-lane Build Alternative.

III. CONCLUSION

We hold that the plain language of section 4(f) regulations 771.135(b) and (*l*) requires the agencies to complete the section 4(f) process prior to the issuance of an ROD fixing the route of the proposed four-lane highway. We also find that the agencies took the "hard look" at the IRA that is required by NEPA. For these reasons we affirm in part and reverse in part the district court's grant of summary judgment for the agencies, and we direct the court to return the matter to the agencies with instructions to complete the section 4(f) process before proceeding further with the Corridor H project.

*So ordered.*