United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 26, 1999 Decided December 17, 1999 

 No. 99-5220

 City of Alexandria, Virginia, et al., 
 Appellees

 v.

 Rodney E. Slater, Secretary, 
 U.S. Department of Transportation, et al., 
 Appellants

 Appeal from the United States District Court 
 for the District of Columbia 
 (98cv00251)

 Daria J. Zane, Assistant United States Attorney, argued 
the cause for appellants. With her on the briefs were Wilma 
A. Lewis, United States Attorney, R. Craig Lawrence, Assis-
tant United States Attorney, Nancy E. McFadden, General 
Counsel, United States Department of Transportation, and 
Paul M. Geier, Assistant General Counsel.

 Barry M. Hartman and Lance W. High were on the brief 
for amicus curiae Greater Washington Board of Trade.

 Richard L. Walton, Jr., Senior Assistant Attorney General, 
State of Virginia, was on the brief for amicus curiae the 
Commonwealth of Virginia, Virginia Department of Transpor-
tation.

 Kathleen A. Morse and Carolyn Moses Frank, Assistant 
Attorneys General, State of Maryland, were on the brief for 
amicus curiae Maryland State Highway Administration.

 S. William Livingston, Jr., argued the cause for appellees. 
With him on the brief were Mitchell F. Dolin and Thomas L. 
Cubbage, III. John N. Hanson entered an appearance.

 Hope M. Babcock, Thomas R. Lotterman, Paul W. 
Edmondson, and Elizabeth S. Merritt were on the joint brief 
for amicus curiae the National Trust for Historic Preserva-
tion in the United States, Preservation Alliance of Virginia, 
and Sierra Club.

 Before: Silberman, Williams, and Randolph, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: Appellees challenged the Feder-
al Highway Administration's approval of plans to replace the 
Woodrow Wilson Memorial Bridge. The district court held 
that the Administration violated the National Environmental 
Policy Act and the National Historic Preservation Act. We 
reverse.

 I.

 The Woodrow Wilson Memorial Bridge is a microcosm of 
the Washington, D.C. metropolitan area's traffic congestion 
problems. Built in 1961, the six-lane structure carries the 
Capital Beltway over the Potomac River, connecting the City 
of Alexandria, Virginia, to Prince George's County, Maryland; 
originally intended to serve as a Washington bypass for 
interstate travelers, it became increasingly used by commut-

ers as the region's population grew. As a result, traffic 
volume on the Bridge has increased to over 160,000 vehicles 
per day, more than twice the capacity the structure was 
designed to accommodate; congestion is particularly acute 
during peak hours, where the configuration of an eight-lane 
Beltway feeding into a six-lane bridge--in addition to steadily 
increasing local traffic in the surrounding communities--has 
produced one of the worst rush-hour "bottlenecks" in the 
region. These congestion problems have created harmful 
collateral consequences: the heavy volume on the Bridge has 
contributed to an accident rate nearly double that of similar 
facilities in the region, and has expedited the deterioration of 
the Bridge's structure to the point where the Bridge is 
projected to be structurally unsound by 2004.

 Efforts to replace the Bridge began over ten years ago, 
when the Federal Highway Administration, in cooperation 
with its coordinate agencies in Maryland, Virginia, and the 
District of Columbia, began examining alternative approaches 
to solving the Bridge's capacity and structural problems. 
The Administration began to study the potential effects of 
rebuilding the Bridge on the surrounding communities early 
in the project's development, commissioning surveys of histor-
ic and archaeological resources in areas likely to be affected 
by the projects. The Commission also started the process, 
mandated by the National Environmental Policy Act (NEPA), 
42 U.S.C. s 4321 et seq. (1994), of considering the environ-
mental impacts of alternative project designs. In 1991 the 
Administration issued a draft Environmental Impact State-
ment (EIS) for public comment; this statement suggested 
and compared five proposals for replacing the Bridge. Each 
of the alternatives in the draft proposed expanding the river 
crossing from six to twelve lanes, and included a similar 
expansion of the five-mile Beltway corridor approaching the 
river crossing from the east and west.1

__________
 1 More specifically, the project would widen the Beltway to twelve 
lanes between Telegraph Road in Alexandria and Route 210 in 
Prince George's County.

 Reaction to the draft was less than enthusiastic; the Ad-
ministration was criticized for assessing inadequately the 
environmental and cultural impacts of its proposal, and for 
failing to coordinate its work with that of interested govern-
mental agencies and community groups. By its own admis-
sion concerned that "a region-wide consensus about the new 
bridge had not been reached," the Administration went back 
to the drawing board. In response the Administration orga-
nized a "Coordination Committee" composed of elected and 
administrative officials from the region to enhance community 
and intergovernmental cooperation. The Committee revisited 
the entire process of developing alternative Bridge designs, 
ultimately soliciting and considering over 350 proposals from 
interested individuals and organizations, and increased the 
Administration's public outreach efforts in affected communi-
ties. In the meantime, pursuant to its obligations under 
section 106 of the National Historic Preservation Act, 16 
U.S.C. s 470f (1985 & Supp.), and section 4(f) of the Depart-
ment of Transportation Act, 49 U.S.C. s 303 (1997), the 
Administration continued to assess the project's potential 
impacts on historic, archaeological, and cultural resources in 
the area.

 In 1997, the Administration issued its Final Environmental 
Impact Statement (the "Final EIS"). The Final EIS gave 
detailed consideration to eight alternative proposals (seven 
"build" alternatives and a baseline "no build" alternative), 
comparing them on a range of criteria including vehicle 
capacity, cost, and extent of environmental impacts. As was 
the case with the draft each of the "build" alternatives 
scrutinized in the Final EIS had twelve lanes; each alterna-
tive also had a lane configuration that separated local and 
express traffic, and contained a lane dedicated for High 
Occupancy Vehicle usage. The critical difference among the 
proposed alternatives was the type of river crossing; the 
seven "build" alternatives included a range of tunnel and 
bridge designs. Although the Final EIS discussed narrower 
eight- and ten-lane options, it did not afford them full treat-
ment as formal "alternatives" because the Administration 
concluded, on the basis of traffic projections, that narrower 

river crossings would fall short of meeting the Bridge's long-
term traffic needs. Among the eight options the Administra-
tion designated a "Preferred Alternative" that would replace 
the Bridge with two parallel six-lane drawbridges (one draw-
bridge for eastbound and one for westbound traffic) clearing 
the Potomac's navigational channel by seventy feet at their 
highest points. The Administration also included in the Final 
EIS a sixty-page "Section 4(f) Evaluation" identifying and 
offering plans to mitigate the effects of the Preferred Alter-
native and all other build alternatives on public parks, wildlife 
refuges, and historic sites.

 After a brief comment period the Administration approved 
the Preferred Alternative in a Record of Decision and submit-
ted, as is required by section 106 of the National Historic 
Preservation Act, a Memorandum of Agreement evidencing 
the Administration's cooperation with state historic preserva-
tion officers in identifying historic sites that might be impact-
ed. The Memorandum identified and offered mitigation plans 
for several historic sites, but it also noted that the Adminis-
tration had not yet identified properties to be used for 
"construction staging, dredge disposal, wetland mitigation, or 
other ancillary activities" during the period of the Bridge's 
construction.

 The City of Alexandria filed an action in the district court 
challenging the Administration's approval of the project, and 
the district court permitted three Alexandria-based organiza-
tions that opposed the Administration's proposed alternative 
(collectively the "Alexandria Coalition" or "appellees") to 
intervene as plaintiffs. The City alleged that the Administra-
tion had violated a host of regulatory provisions, including the 
National Environmental Policy Act, section 106 of the Nation-
al Historic Preservation Act, and section 4(f) of the Depart-
ment of Transportation Act.2 After both sides had filed for 
summary judgment the City of Alexandria settled its claim 

__________
 2 The City also alleged that the Administration violated the Clean 
Air Act by failing to conduct a conformity analysis for the twelve-
lane preferred alternative. The district court agreed, but the 
Administration does not appeal this finding.

with the Administration, leaving the Alexandria Coalition as 
the only remaining plaintiffs.

 The district court ruled in favor of the Alexandria Coalition. 
See City of Alexandria v. Slater, 46 F. Supp. 2d 35 (D.D.C. 
1999). The court concluded that the Administration had 
violated NEPA by not affording detailed consideration to a 
ten-lane river crossing as a "reasonable alternative" in the 
Final EIS, and that the Final EIS' treatment of the tempo-
rary environmental impact of the construction phase of the 
project was too cursory to satisfy NEPA. Relying upon our 
recent decision in Corridor H Alternatives, Inc. v. Slater, 166 
F.3d 368 (D.C. Cir. 1999), the district court also determined 
that the Administration had violated section 106's require-
ment that an agency "take into account" the effects of a 
proposed project on protected historic properties by postpon-
ing the identification of the sites that were to be used for 
construction-related "ancillary activities." Because an agency 
must complete the section 106 identification process before it 
can satisfy section 4(f)'s requirement that an agency use "all 
possible planning to minimize harm" to historic sites, the 
court concluded that the Administration had necessarily failed 
to comply with section 4(f) as well. The district court re-
manded the project to the Administration; the Administra-
tion appealed, as it is entitled to do. See Occidental Petrole-
um Corp. v. SEC, 873 F.2d 325, 330 (1989) (when district 
court remand obliges agency to take further actions under an 
arguably incorrect legal standard an immediate appeal is 
appropriate).

 II.

 A.

 The National Environmental Policy Act's mandate "is es-
sentially procedural," Vermont Yankee Nuclear Power Corp. 
v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558 
(U.S. 1978); the statute requires that agencies assess the 
environmental consequences of federal projects by following 
certain procedures during the decision-making process. See 
Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 

193-94 (D.C. Cir. 1991). Before approving a project, an 
agency must prepare a "detailed statement ... [on] the 
environmental impact of the proposed action, any adverse 
environmental effects which cannot be avoided should the 
proposal be implemented, [and] alternatives to the proposed 
action." 42 U.S.C. s 4332(2)(C)(i)-(iii). These general pre-
scriptions are given sharper focus in the Council on Environ-
mental Quality's regulations,3 which require agencies to pre-
pare environmental impact statements; at the "heart of the 
environmental impact statement" is the requirement that an 
agency "rigorously explore and objectively evaluate" the pro-
jected environmental impacts of all "reasonable alternatives" 
for completing the proposed action. 40 C.F.R. s 1502.14.

 Appellees argue, and the district court agreed, that the 
Administration violated NEPA by failing to deem a ten-lane 
bridge a "reasonable alternative" in the Final EIS. They 
observe that a ten-lane bridge would constitute a significant 
improvement over the existing six-lane structure, and would 
reduce congestion with considerably less impact on environ-
mental and cultural resources than each of the twelve-lane 
alternatives compared by the Administration. In addition to 
having a narrower river crossing, appellees point out that a 
ten-lane alternative would have a smaller construction "foot-
print" along the entire five-mile stretch of the Beltway that 
will be under construction, and would require smaller inter-
changes at each of the four points of access to the Beltway in 
the project corridor. The Administration responds that the 
ten-lane alternative favored by appellees was excluded after 
studies determined that it did not meet the traffic capacity 
needs of the project. The Administration also argues that 

__________
 3 The Council on Environmental Quality has no express regulato-
ry authority under the National Environmental Policy Act; instead, 
the Council was empowered to promulgate binding regulations by 
President Carter's Executive Order No. 11991, 42 Fed. Reg. 26,967 
(1977). Because the Administration does not challenge the Coun-
cil's regulatory authority, we treat the Council's regulations as 
binding on the agency. But see Scott C. Whitney, The Role of the 
President's Council on Environmental Quality in the 1990s and 
Beyond, 6 J. Envtl. L. & Lit. 81 (1991).

the difference between the environmental impacts of the two 
projects is less than appellees suggest; a ten-lane bridge 
would impact only 1.6 fewer acres of parkland and 12.9 fewer 
acres of natural resources over the entire length of the 
project corridor, and would have an identical impact on 
cultural resources.

 How are the merits of appellees' argument to be assessed? 
After all, the phrase "reasonable alternative," standing alone, 
offers no guidance to a reviewing court. Something can only 
be an "alternative" by reference to something else; "the term 
'alternatives' is not self-defining." Vermont Yankee, 435 U.S. 
at 551. The Council on Environmental Quality, for its part, 
does little to clarify the baseline against which a "reasonable 
alternative" is to be measured; its regulations at times ap-
pear to contrast the "alternatives" to the "proposal," suggest-
ing that the range of reasonable alternatives are to be 
selected by reference to the project implemented. See 40 
C.F.R. s 1502.14. But that approach would seem to bias the 
process. See, e.g., Calvert Cliffs' Coordinating Comm., Inc. v. 
U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1114 (D.C. Cir. 
1971). And even if we were to understand an "alternative" to 
be defined by reference to the proposal actually selected, our 
interpretive task would hardly be easier, as "the adjective 
'reasonable' is no more self-defining than the noun that it 
modifies." Citizens Against Burlington, 938 F.2d at 195.

 We have resolved this difficulty by evaluating an agency's 
choice of "reasonable alternatives" in light of the objectives of 
the federal action; as then-Judge Thomas put it in Citizens 
Against Burlington, "[t]he goals of an action delimit the 
universe of the action's reasonable alternatives." Id. But 
that approach of course requires that we first consider wheth-
er the agency has reasonably identified and defined its objec-
tives. The agency's choice of alternatives are, then, evaluated 
in light of these stated objectives; an alternative is properly 
excluded from consideration in an environmental impact 
statement only if it would be reasonable for the agency to 
conclude that the alternative does not "bring about the ends 
of the federal action." Id. We engage in both of these 
inquiries--whether an agency's objectives are reasonable, and 

whether a particular alternative is reasonable in light of these 
objectives--with considerable deference to the agency's ex-
pertise and policy-making role. Id. at 196.

 The district court's opinion suggests that the Administra-
tion improperly defined its objectives, criticizing the Adminis-
tration for narrowing its choice of alternatives "based on a set 
of criteria that focused primarily on transportation and safety 
issues." City of Alexandria, 46 F. Supp. 2d at 44. This 
description of the Administration's objectives is an accurate 
one; while the "Statement of Purpose and Need" in the Final 
EIS references several objectives (including protecting the 
environment), it focuses on the region's traffic needs. But it 
hardly follows that the Administration violated NEPA. As 
mentioned above, NEPA's injunction that agencies consider 
the environmental impacts of "all reasonable alternatives" 
does not substantively constrain an agency's choice of objec-
tives; to the contrary, it is those very objectives that provide 
the point of reference for a determination whether an alterna-
tive is "reasonable" in the first place. By suggesting that the 
Administration violated NEPA because it did not sufficiently 
prioritize environmental goals, the district court subtly--and 
impermissibly--transformed a procedural statute into a sub-
stantive one. See Baltimore Gas & Elec. Co. v. Natural 
Resources Defense Council, Inc., 462 U.S. 87, 97 (1983) 
("Congress in enacting NEPA ... did not require agencies to 
elevate environmental concerns over other appropriate con-
siderations.") The proper question to ask at the outset of a 
NEPA inquiry is not whether the Administration focused on 
environmental goals but rather--as we noted--whether its 
stated objectives were reasonable. It seems rather obvious 
to us that it is not unreasonable in articulating its objectives 
for an agency to "focus primarily on transportation and safety 
issues" when replacing a massively congested and structurally 
unsound bridge. Cf. Corridor H, 166 F.3d at 374 (affirming 
the Administration's rejection of highway alternatives that 
did not meet the transportation and safety needs of the 
region).

 More in keeping with our precedent, the district court also 
determined that a ten-lane alternative was reasonable--and 

therefore should have been given greater attention--in light 
of these objectives. The district court arrived at this conclu-
sion by characterizing the Administration as "articulat[ing] 
the problem as one of addressing the future transportation 
needs of the region." "Such a broad statement of purpose 
and need," the district court explained, "hardly provides an 
unequivocal basis for eliminating ten-lane alternatives from 
consideration." City of Alexandria, 46 F. Supp. 2d at 44. 
This might be so, had the Administration truly characterized 
its objectives in such general terms. But it did not. As is 
required by statute, see 23 U.S.C. s 109(b), the Administra-
tion instead focused specifically--in its Statement of Purpose 
and Need and elsewhere--on the traffic needs that will exist 
twenty years after the project's approval, and its analyses 
based on 2020 traffic projections demonstrate that a ten-lane 
bridge would be insufficient. The Administration's studies 
show that appellees' preferred design (a ten-lane configura-
tion without an HOV lane) would be able to accommodate less 
than half of the per-hour capacity of the Administration's 
preferred alternative, causing peak-hour traffic queues of 
significantly greater length and extended duration; accident 
rates would also be markedly higher on a ten-lane structure.

 The district court ignored this data, instead focusing exclu-
sively on an Administration study showing that a ten-lane 
bridge would be able to accommodate up to 295,000 vehicles 
per day, a number only slightly smaller than the projected 
daily traffic flow on the Bridge in 2020. City of Alexandria, 
46 F. Supp. 2d at 44. But that study apparently assumed an 
even flow of traffic throughout the day (which, of course, is 
unrealistic). Whatever the total number of vehicles that will 
cross in a 24-hour period, the relevant question is how long 
during peak commuting hours it will take to cross the bridge. 
Appellees also do not seriously challenge the Administration's 
findings, instead protesting that these studies establish little 
more than the "truism ... that a ten-lane bridge would carry 
somewhat less traffic than a twelve-lane bridge." It is not 
apparent to us why this proposition has less force in the case 
because it is a "truism."

 Appellees' more fundamental argument is that, regardless 
of its shortcomings in satisfying future traffic needs, we must 
hold a ten-lane bridge to be a reasonable alternative in light 
of our statement in Natural Resources Defense Council, Inc. 
v. Morton that an agency should not "disregard alternatives 
merely because they do not offer a complete solution to the 
problem." 458 F.2d 827, 836 (D.C. Cir. 1972). Appellees 
overread Morton. In that case an environmental group 
challenged the Secretary of the Interior's proposed sale of oil 
and gas leases to submerged lands in the Gulf of Mexico; the 
Secretary sought to sell these properties as part of a cross-
agency effort, initiated by the President, to increase Ameri-
can energy supplies. We held that the Secretary's environ-
mental impact statement violated NEPA because it failed to 
consider alternatives outside of the Department of the Interi-
or's jurisdiction; we also noted that the agency could not 
exclude alternatives "supplying only part of the energy that 
the lease sale would yield." Id. at 836. This broad articula-
tion of "reasonable alternatives" was compelled by the nation-
al scope of the problem being addressed: "When the pro-
posed action is an integral part of a coordinated plan to deal 
with a broad problem, the range of alternatives that must be 
evaluated is broadened." Id. at 835.

 Morton thus stands for the same proposition as Citizens 
Against Burlington: namely, that a "reasonable alternative" 
is defined by reference to a project's objectives. Morton 
explained that, within the context of a coordinated effort to 
solve a problem of national scope, a solution that lies outside 
of an agency's jurisdiction might be a "reasonable alterna-
tive"; so might an alternative within that agency's jurisdiction 
that solves only a portion of the problem, given that other 
agencies might be able to provide the remainder of the 
solution. Such a holistic definition of "reasonable alterna-
tives" would, however, make little sense for a discrete project 
within the jurisdiction of one federal agency, as we recognized 
in Morton when we contrasted the Secretary's action with 
that of building "a single canal or dam."4 Id. Concerned 

__________
 4 We doubt the continuing vitality of the rather expansive view of 
NEPA we expressed in Morton, since subsequent Supreme Court 

with severe traffic conditions in the Capital Region, Congress 
has authorized the Administration to replace the Woodrow 
Wilson Memorial Bridge. The Administration has sole re-
sponsibility for solving this problem; were it to build a ten-
lane bridge, no one else would step in and alleviate the 
congestion that would result.5 In this context, it is simply a 
non sequitur to call a proposal that does not "offer a complete 
solution to the problem" a "reasonable alternative."

 One other point merits brief discussion. In finding a ten-
lane alternative reasonable, the district court noted that the 
Administration only conducted a Clean Air Act conformity 
analysis for the use of ten lanes on the Bridge. See City of 
Alexandria, 46 F. Supp. 2d at 45. If the Administration only 
expects ten lanes to be open, the district court reasoned, how 
can it fail to consider a ten-lane bridge as a reasonable 
alternative under NEPA? The answer is that the Clean Air 
Act and NEPA inquiries have different time horizons; while a 
project must show conformity with the Clean Air Act at the 
time it is approved, see 42 U.S.C. s 7506(c)(1) (1995), the 
consideration of reasonable alternatives under NEPA re-
quires, as mentioned above, an assessment of traffic needs in 
2020. Accordingly the Administration did not violate the 

__________
cases have directly criticized us for overreading that statute's 
mandate. See Baltimore Gas & Elec. Co., 462 U.S. at 97; Vermont 
Yankee, 435 U.S. at 554; Kleppe v. Sierra Club, 427 U.S. 390 (1976). 
Morton, after all, suggested that the Secretary should have deemed 
as "reasonable alternatives" Congress' ability to reduce oil import 
quotas and the Federal Power Commission's authority to change its 
natural gas pricing policies. 458 F.2d at 835, 837. To be sure, 
Vermont Yankee cited with approval our statement in Morton 
stressing the limits of an agency's obligations under NEPA, 435 
U.S. at 551, but we wonder whether Morton's holding can be 
squared with Vermont Yankee's injunction that "the 'detailed state-
ment of alternatives' cannot be found wanting simply because the 
agency failed to include every alternative device and thought con-
ceivable by the mind of man." Id.

 5 As the Administration determined, there are no apparent and 
feasible independent rail transit options that could be combined to a 
ten-lane bridge to satisfy transportation needs.

National Environmental Policy Act by failing to include a ten-
lane bridge proposal as a "reasonable alternative" in its Final 
Environmental Impact Statement.

 B.

 Once an agency identifies the "reasonable alternatives" to a 
proposed action, NEPA and Council on Environmental Quali-
ty regulations also require an agency to identify the "adverse 
environmental effects" of each alternative. See 42 U.S.C. 
s 4332(2)(C)(ii); 40 C.F.R. s 1502.16. The district court 
found fault with the Administration's treatment of the tempo-
rary "construction impacts" that would arise during the peri-
od that the Bridge was being built. Again, we disagree.

 The district court focused on the brevity of the "Construc-
tion Impacts" section of the Final EIS, which covers only four 
pages and, according to the district court, "is of such a broad 
and generic nature that it could apply to practically any 
construction project undertaken by the [Administration]." 
City of Alexandria, 46 F. Supp. 2d at 45. While the Adminis-
tration's discussion might have been more thorough, we think 
the district court's assessment of the Administration's treat-
ment of these issues too harsh. The Administration address-
es a range of expected construction impacts, including the 
construction's likely effect on local traffic, air quality, area 
noise levels, water quality and wetlands, cultural resources, 
and visual effects. The level of detail of these assessments 
varies; it is worth noting, in light of the district court's focus 
on the terseness of the Administration's analysis, that some of 
the shorter analyses are the most eminently reasonable. 
Take, for instance, the Administration's discussion of traffic 
impacts. The Administration acknowledges that the con-
struction project will affect traffic flow on several Alexandria 
roadways, and may also cause potential delays in the delivery 
of emergency services. It also offers a range of mitigation 
strategies: six lanes of the Bridge will be kept open at all 
times to minimize rush-hour congestion; some access (even if 
circuitously routed) will be maintained to all roads and areas; 
there will be no disruption of marine traffic on the Potomac; 

the public will be notified of temporary road closings through 
the news media, the posting of signs, and the creation of a 
"project activities" hotline. Perhaps appellees would prefer 
the Administration to set forth in the Final EIS a comprehen-
sive plan detailing precisely which streets will be closed, and 
which alternative routes will be established, but that is not 
mandated by NEPA. See, e.g., Robertson v. Methow Valley 
Citizens Council, 490 U.S. 332, 353 (1989) ("[I]t would be 
inconsistent with NEPA[ ] ... to demand the presence of a 
fully developed plan that will mitigate environmental harm 
before an agency can act.").

 We think the terseness of the Administration's discussion 
of construction impacts is justified for other reasons as well. 
The Administration typically delays the identification of "con-
struction staging" sites--locations used to store materials and 
equipment during project construction--until the design 
stage of the project. As will be discussed infra, this practice 
is permissible under the statute and is arguably required by 
the Administration's governing regulations. Since the Ad-
ministration did not identify the location of these areas, it of 
course could not identify the accompanying environmental 
impacts with precision. But this does not mean that the 
Administration did not consider, on a more general level, 
what those impacts would be; the Final EIS identifies several 
potential staging areas, and notes that each of these sites are 
in "previously disturbed" areas with "minimal natural re-
sources." The Administration's brevity is particularly under-
standable given the numerous regulatory constraints that will 
limit the extent of construction activities. As the Administra-
tion notes, Maryland and Virginia require construction con-
tractors to limit noise levels in "noise sensitive areas adjacent 
to the project area" to eighty decibels--a noise level compara-
ble to that currently produced by traffic on some stretches of 
the highway. Similar federal and state regulatory provisions 
require the mitigation of any short-term construction impacts 
on wetland and aquatic resources, constrain the emissions of 
dust from construction-related activities and equipment, and 
limit the Administration's selection of construction staging 
areas. The Final EIS' reference of these provisions is impor-

tant, as it indicates the Administration's awareness of the 
maximum impact that the construction may cause.

 We also note that agencies are enjoined by the Council on 
Economic Quality to develop environmental impact state-
ments that are "no longer than absolutely necessary" and that 
discuss impacts "in proportion to their significance." 40 
C.F.R. s 1502.2(b)-(c). The Administration points out that 
each of the seven "build" alternatives would have similar 
construction impacts, thus making a detailed discussion of 
each of their effects redundant. More fundamentally, while 
the disruption caused by the construction of a project as 
significant as this one is by no means trivial, it is relatively 
modest in both scope and duration when compared to the 
environmental impact of the project as a whole. To be sure, 
there is a point at which an agency's analysis ventures from 
the "tolerably terse to the intolerably mute," Greater Boston 
Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970), 
but we simply do not think that the Administration's analysis 
of construction impacts reaches that point.

 III.

 A.

 The district court concluded that the Administration also 
failed to identify adequately the effect that its preferred 
alternative will have on historic resources in the project area, 
as is required under two distinct but overlapping statutes: 
section 106 of the National Historic Preservation Act and 
section 4(f) of the Department of Transportation Act. Sec-
tion 106, like NEPA, is essentially a procedural statute; it 
requires that agencies "take into account the effect of [an] 
undertaking on any district, site, building, structure, or object 
that is included in or eligible for inclusion in the National 
Register [of Historic Places]." 16 U.S.C. s 470f. To comply 
with section 106, an agency must consult with state historic 
preservation officers to ensure that historic properties in the 
project area are thoroughly identified and the effects that the 
project will have on them fully assessed. See 36 C.F.R. 

s 800.4-.5.6 The usual product of this consultation process is 
a Memorandum of Agreement among the consulting parties 
signifying agreement upon how the detrimental effects will be 
"taken into account." Even where disagreement precludes 
the completion of a Memorandum of Agreement an agency 
may implement a project after receiving and considering 
comments from the Advisory Council on Historic Preserva-
tion. See id. at 800.6(c).

 On the other hand, section 4(f), unlike the other statutes at 
issue in this case, imposes a substantive mandate on the 
Administration: It prohibits the agency from taking an action 
that "uses" a historic resource unless there is "no prudent 
and feasible alternative to using that land" and the agency 
engages in "all possible planning" to "minimize harm" to the 
sites.7 49 U.S.C. s 303(c); see also Citizens to Preserve 
Overton Park v. Volpe, 401 U.S. 402 (1971). Department of 
Transportation regulations require the Administration to 
"make the section 4(f) approval" at the same time that it 
approves its final EIS or issues its Record of Decision, 23 
C.F.R. s 771.135(l); the Administration ordinarily complies 
with this requirement by publishing a separate "Section 4(f) 
Evaluation" along with its final EIS, which identifies the 
project's effects on historic properties in the project area and 
the efforts the agency has taken to mitigate those effects. In 
order to comply with 4(f)'s substantive requirements, it is of 
course necessary first to identify historic sites in the project 
area; accordingly, we have observed that compliance with 
section 4(f) is predicated upon completion of the section 106 
process. See Corridor H Alternatives, Inc. v. Slater, 166 
F.3d 368, 371 (1999).

__________
 6 The Council has recently promulgated regulations revising the 
section 106 process. 64 Fed. Reg. 27,044 (1999). Our citations are 
to the regulations as they existed at the time the Administration 
approved the project.

 7 In addition to historical sites, other properties--including parks, 
recreational areas, and wildlife preserves--are protected by section 
4(f).

 The central dispute between the parties is not about wheth-
er, but about when, the Administration must complete its 
identification of historic properties. The Administration has 
been "taking into account" the effect of the proposed project 
on historic sites since the project's inception, conducting 
several surveys which led to the identification of 23 National 
Register-listed or National Register-eligible properties, and 
36 underwater or terrestrial archaeological sites in the pro-
ject area. The Administration also identified and visited each 
National Register-listed property in Alexandria for the pur-
pose of determining, among other things, the "visual impacts" 
that various alternative bridge proposals would have on each 
site. The result was publication of a Memorandum of Agree-
ment and a Section 4(f) Evaluation with or prior to the 
Administration's approval of the project; these documents 
identify seven historic sites that will be affected by the 
project and another six that may be, and offers plans to 
minimize and mitigate the project's impact on these proper-
ties.

 The district court did not question the overall legitimacy or 
thoroughness of these studies.8 (Indeed, appellees cannot 
identify a single historic resource in the project area that the 
Administration failed to "take into account."9) Instead, the 

__________
 8 Appellees point to the Administration's decision to reduce the 
size of the "Area of Potential Effects" in 1997, and suggest that the 
Administration reduced this Area in an attempt to evade section 
106's obligations. The Administration offers a perfectly innocent 
explanation, which we have no reason to question: The Area of 
Potential Effects was originally drawn with a range of alternatives 
in mind, including taller bridge designs with far more extensive 
"visual effects" in Alexandria. It was then reduced to encompass 
only those areas affected by the preferred alternative. Notably, 
appellees do not point to any properties outside of the new "re-
duced" Area of Potential Effects that will actually be affected by 
the project.

 9 Amicus Sierra Club rather inventively argues that the Adminis-
tration failed to treat as a section 106/4(f) property the Hunting 
Terrace apartment complex in Alexandria, but it is not eligible for 
inclusion in the National Register of Historic Places, and therefore 

district court concluded that the Administration violated sec-
tion 106 by deciding to postpone the identification of sites 
where it would conduct certain construction-related activities, 
including construction staging areas (the locations where 
contractors will store materials and mobilize construction 
activities), wetland mitigation areas, and dredge disposal 
sites. While the likely impact of these activities, which the 
Administration describes as "ancillary," are minimal when 
compared to those of the project as a whole, it is at least 
conceivable that they could ultimately affect section 106 prop-
erties. Acknowledging this possibility, but noting that it 
usually defers the identification of such properties until the 
"design stage" of a large highway project, the Administration 
included promissory language in its Memorandum of Agree-
ment binding it to fulfill its section 106 responsibilities when 
selecting these sites. The district court thought that these 
prospective terms ran afoul of our recent decision in Corridor 
H Alternatives, Inc. v. Slater, 166 F.3d 368 (D.C. Cir. 1999), 
in which we held that the Administration could not postpone 
the entire section 106 process until after it issued its Record 
of Decision.

 We think that district court misconstrued our holding in 
Corridor H. In that case, the Administration postponed the 
entire section 106 process for a major highway corridor; its 
Record of Decision instead adopted a "Programmatic Agree-
ment" dividing the highway into fourteen segments, and 

__________
is not a protected property under either section 106 or section 4(f). 
See 23 C.F.R. s 771.135(e); 36 C.F.R. s 800.2(e). Showing similar 
ingenuity, appellees argue that the Administration violated sections 
106 and 4(f) because "the boundaries of Freedman's Cemetery ... 
have still not yet been determined." They apparently believe that 
since the site's precise location is unknown (and, it seems, unknow-
able), it is by definition impossible to know for certain the "effect" 
that the construction will have on the site, thus placing the Adminis-
tration in violation of sections 106 and 4(f). To set forth the logic of 
this argument is to refute it. Cf. Hoonah Indian Ass'n v. Morri-
son, 170 F.3d 1223, 1231-32 (9th Cir.1999) (inability of Forest 
Service to identify location of Indian march justified decision not to 
designate it a section 106 property).

promised that it would not begin construction of a particular 
segment before completing the section 106 process for that 
segment. We held that this Agreement impermissibly abro-
gated the Administration's responsibility to assess the pro-
ject's impact on historic properties during the planning stages 
of the project. See 166 F.3d at 373. But that is not the case 
here, since the Administration has identified historic proper-
ties along the entire project corridor and documented its 
findings prior to approval in both a Memorandum of Agree-
ment and a Section 4(f) Evaluation. All that has been 
deferred is the identification of sites that might be impacted 
by a small number of "ancillary activities." This is quite 
distinguishable from the "Programmatic Agreement" we pro-
scribed in Corridor H.

 The Administration did not postpone the identification of 
these properties "merely to avoid having to complete its 4(f) 
and 106 analyses," as the district court said. 46 F. Supp. 2d 
at 47. As the Administration points out, the precise identifi-
cation of these sites requires "substantial engineering work" 
that is not conducted until the design stage of the project; 
indeed the Administration is required to conduct such "final 
design activities" after it completes its Final EIS. 23 C.F.R. 
s 771.113(a)(iii). Furthermore, then-existing Council regula-
tions explicitly encouraged flexible, staged planning in the 
section 106 process. See 36 C.F.R. s 800.3(b) (section 106 
procedures "may be implemented ... in a flexible manner"); 
36 C.F.R. s 800.3(c) (section 106 regulations should not be 
interpreted to "prohibit phased compliance at different stages 
in planning."). Appellees respond that the Administration 
could nonetheless "feasibly" identify these sites without doing 
"final design" plans for the project. But the standard of 
"feasibility," while relevant to whether an agency may use 4(f) 
properties, has no application in determining when the agency 
must identify them. We think that, particularly where the 
sites postponed are merely ancillary to the project, section 
106 and the identification prerequisites of section 4(f) do not 
forbid the rational planning process adhered to by the Admin-
istration.

 B.

 We also think that the Administration satisfied section 
4(f)'s substantive provisions. Appellees barely bother to ar-
gue that the Administration did not comply with section 
4(f)(1)'s requirement that it consider all "prudent and feasible 
alternative[s]" to using protected properties. The reason for 
this gap in appellees' otherwise vigorous presentation is obvi-
ous enough. For while the Administration is required to give 
the protection of 4(f) property "paramount importance" in 
determining whether an alternative is "prudent," Overton 
Park, 401 U.S. at 412-13, we have squarely held that an 
alternative cannot be a prudent one if it does not satisfy the 
transportation needs of the project. See Citizens Against 
Burlington, 938 F.2d at 204. In light of this limitation, 
appellees can only win under section 4(f)(1) if they establish 
one of two propositions: They must show that a narrower 
Bridge satisfies the transportation needs of the project, or 
they must offer a "prudent" project alternative that does not 
impact the 4(f) properties used by the Administration's pre-
ferred design. The former question we have already resolved 
in the Administration's favor, and appellees do not advance an 
alternative highway route that has a less significant impact on 
4(f) properties.

 Appellees do argue with greater enthusiasm that the Ad-
ministration violated section 4(f)(2)'s requirement that the 
agency engage in "all possible planning" to minimize harm to 
4(f) properties, but this argument is equally unpersuasive. 
To begin at the broadest level of generality, appellees do not 
question the Administration's express findings that, among 
the seven "prudent and feasible" alternatives compared in the 
Final EIS, the preferred alternative "results in the least 
overall impact to section 4(f) resources." Cf. Druid Hills 
Civic Ass'n, Inc. v. FHWA, 772 F.2d. 700, 716 (11th Cir. 
1985) (noting that "section 4(f)(2) requires a simple balancing 
process which totals the harm caused by each alternate route 
to section 4(f) areas and selects the option which does the 
least harm"). At the site-specific level, the Administration 
made several significant project modifications to avoid or 
minimize impacts to section 4(f) properties, including altering 

an interchange design to avoid impacting a schoolground and 
eliminating the construction of a temporary Beltway overpass 
to minimize the risk of harm to Freedman's Cemetery. 
Where the Administration could identify no feasible and 
prudent plan for avoiding impact to a 4(f) site, it offered plans 
to mitigate that impact; for instance, it proposed substantial 
improvements to Jones Point Park, arguably the most signifi-
cant 4(f) property impacted by the project. Further recita-
tion of the Administration's mitigation efforts is possible, but 
unnecessary; suffice it to say that, after a thorough review of 
the record, we have little difficulty concluding that the Ad-
ministration complied with its responsibilities under section 
4(f) of the Department of Transportation Act.10

 * * * *

 During the course of our consideration of this case, appel-
lees have attempted to bolster their position by pointing to 
the opposition of prominent legislators to the project, and by 
noting the hurdles to ultimate congressional approval that 
still lie in the Administration's path. These political impedi-
ments are irrelevant to us but they indicate where appellees 
should concentrate their efforts. We have been admonished 
by the Supreme Court with respect to the very statute that is 
at the heart of this case to avoid using its requirements as a 
vehicle to impose our own judgment. Vermont Yankee, 435 
U.S. at 554. Our obligation is not to further our beau ideal of 
a bridge design, but merely to ensure that the procedures 
mandated by these statutes have been complied with. We 
hold that the Administration has satisfied the requirements of 

__________
 10 Appellees correctly note that section 4(f)'s substantive require-
ments can only be complied with after section 4(f) properties have 
been identified. We remind the Administration that our holding 
that it could defer the identification of section 4(f) properties that 
might be impacted by construction staging and dredge disposal 
activities in no way absolves it of its responsibility to conduct a 4(f) 
analysis when selecting these sites during the design stage of the 
project.

NEPA, the National Historic Preservation Act, and the De-
partment of Transportation Act, and reverse.

 So ordered.